Good morning, Your Honors. John Lanihan on behalf of Mr. Serrano, who is the appellant. I only have 10 minutes. I look at this as a series of Russian dolls. Each doll has a different aspect of a Fourth Amendment violation. And Judge Kristen, you say, get to your strongest arguments. So I will bypass the Randolph, whether this is Georgia v. Randolph. I will, okay, figure we're not going to waste time on that. The issue really comes down to what is the search of the locked tool bench? Well, or is it a search, or is it plain view? So I have a problem with that, and I think there's a question. So we have case law inside it that says that a light alone isn't going to transform something into a search if it's not a search, right?  Okay, and so this one seems a little bit different. We've all looked at the video, and there's an officer peering in through a crack. It's not a case where the drawers were open. We have other cases where drawers open a little bit. I think it's uncontested these were locked. Right. But he can see it without opening the drawer. Well, I hate to go into what is clearly erroneous standard, but as I look at that video, if you look at the two videos, and I think it's specifically in videos 5 and 12, initially the wife pulls on the drawer. It won't open, and you can see how much it opens, and then the police are looking at it. He claims it's an inch and a half. I don't think it's an inch and a half. Well, he says he can see white powder, and he says he can see a scale, I believe.  And he decides, and I think this is what the district court was relying on. She says, by the way, there's no seizure there. There's no seizure that results from that. In fact, they told the family they were going to go home, and they couldn't arrest him. Correct. Right. So the issue with it, that doesn't actually lead into, and at the time, the police said there isn't enough probable cause to arrest him. So they had to go further. Right. So if I decide that the district court was correct on the plain view doctrine as to what you're calling a search, the peek into the locked file cabinet, I don't understand your fruits argument as to the second. What I'm thinking of is a separate episode. Well, I mean, I don't think there was enough probable cause based on that, and I'm saying it's a search. I mean, there's two parts of the First Amendment. There's the unreasonable search, and then there's the unreasonable seizure. Okay, but they didn't seize anything. Correct. Right. And they said, we don't have enough. We're leaving. And then when I think of this as episode two, the family says, well, what if we accuse him? There's that video. I don't know which one it is. The officer is saying he's accused of rape. They say, what if we accuse him of drug trafficking? He's got drugs in there. And that starts a whole separate episode where the family winds up unlocking the cabinet. Correct. Well, I'm not contesting the search that's initially involving the rape. I know, I know. Correct. I mean, that's why they're there. That's a whole separate basis. My question is, maybe not asked very clearly. My question is, even if we agree that the peak into the file cabinet was a search that exceeded the scope of the plain view doctrine, right, nothing was seized from it. And there's this intervening, I think, second episode where the family raises a separate concern and they wind up opening the file cabinet. Correct. So, what is it? I don't understand your fruits argument. Well, I mean, the fruits argument comes in. Well, the fruits argument is that in opening the drawer, that's when they actually have sufficient evidence to then put in the search warrant. That's the fruits. The fruits is really what happens after the drawer is open. I see. All right. So, the issue then comes down to, I mean, I think it's very clear that the intention of Mr. Serrano was that other persons would not have access to that. Now, I know his wife claims that somehow or other she had looked in, but that was clearly not with his permission. That was a locked cabinet. It was meant only for him. So, then the question is, is it ultimately a private search? Because it's clear that he doesn't want anybody else looking at it. So, then, as I'm looking at the circumstances, essentially, Ms. Valenzuela, at this point, was trying to get additional information to get her husband arrested because they had told her, we don't have enough. I think she's pretty clear about that. She's concerned about the safety of her family. So, the district court decides this is a private search. Well, actually, I have looked at this pretty carefully. And if you look at the tape, if you look at D12, somewhere around, toward the end of it, I think it's, they start discussing this around four minutes to six minutes. Her concern is not for the safety of her family. In fact, she doesn't actually want to leave the house.  How can you say that? Well. It was absolutely clear that she was concerned about the safety of her family. And that was a big driver in the whole thing. Well, but she doesn't say that. And the officers repeatedly said, we can't help you, we can't help you, we can't help you. They were concerned. They moved privately. And as long as it was done privately, on what basis do you complain about the fruits in this case? Well, I mean, as I'm looking at the actual discussion, she doesn't want to leave the house. She is concerned. She appears to have a certain annoyance that she has to take things out of the house and leave for 48 hours. The concern is not that he will come back. The concern is he will go to Mexico. Well, she was concerned about that, but she was also concerned about her safety and the safety of her daughters. They voiced that. Well, I mean, obviously, I am looking at it differently because if she's really not concerned about leaving, I mean, if she's not concerned about leaving the house and she wants to stay, then, so I don't, I don't think the concern... She wanted, did she not, for him to be arrested so they would not be in danger. And she wanted to use... The officers repeatedly said, we can't help you, we can't help you, we can't help you. And then she took matters into her own hands privately. They didn't tell her to do it. She did it because she was concerned, right? Well, and she wanted to use the police to do that. She wanted to make sure they were there. She wanted to make sure that the search happened so that they were there so that they would then have him arrested. He was outside. I mean, he wasn't coming in. There was no danger at that point. So, I think the... And actually, in looking at the way the police were handling her, they knew she was concerned, but they were essentially saying, the only way this can happen is if you open it. And that, to me, now says, the only way this can happen is you're working with us. So... Why do you have to interpret it that way? If her motivation was self-preservation, protect her daughter, including the one that had been raped, she was concerned. Why do you say that that deputizes her? It seemed to me the police, in this case, were actually extraordinarily careful to say, to limit what they could do. They told him that repeatedly. Well, but then... Why did that deputize them? But then when she says, well, do you want me to open it? And he says, sure. I think that's showing that they... Want to show me. He said, do you want to show me? Okay. But he repeatedly said, I can't break it open. I can't do this. It's locked. It's his. He's not going to prevent her from... You seem to be arguing that he had a duty, the officers had a duty to prevent her from undertaking a private search. Well, I... Okay. To me, I think the way she was being treated by the police and the way that they were trying to use her was to try and say, I know I can't open it. I know I don't have the probable cause. But is doing it in such a way that if she agrees to do it, then we get to see it. So you think that they were encouraging her impliedly?  All right. We haven't given Judge Forrest an opportunity to ask a question. Do you have any? No. Okay. Do you want to reserve the rest of your time, sir? All right. Thank you. You bet. I'll come back for rebuttal. Yes. All right. Good morning, Your Honors. May it please the court. Nicholas Pilchak for the United States. This court should affirm Mr. Serrano's convictions for possession of methamphetamine with intent to distribute and possession of an illegal silencer and an AR-15 style rifle as a five-time felon. As a district court found in its carefully reasoned written decision, every step of the warrantless search of Mr. Serrano's and the family's garage and Mr. Serrano's tool bench was supported by a well-established exception to the warrant requirement. Can I focus you on the thing that we were just talking about with your friend across the aisle in terms of the legal standard is that for private action to be attributed to the government, the government either has to be a direct participant in that private action or an indirect encourager, basically.  But acquiescence all by itself, not enough. Right. So I'm curious, if we agree with your view of this case, how do we write the rule so that it stays cabined? Like what meaning do we give to indirect encouragement, right? Because this case has some similarity to the Reed, I think it's the Reed case, which was the hotel case. And how do we still give effect or meaning to this indirect encourager if we say that that didn't happen in this case? So I think there's multiple ways to do that. One, I don't think the court needs to write a new rule in this case. I think the existing rules answer all the legal questions. Counsel, could you move closer to the mic? I can't hear you. Certainly. I apologize. I think the existing rules answer all of the questions in this case. As to encouraging and inducing, I think in this case the factual record is clear that the police didn't do that. As Judge Smith's questions alluded to, they were very scrupulous. Multiple police officers said, we can't break this open. We can't tell you what to do. They don't manipulate the tool bench. They rely on whatever state it's in. After Ms. Valenzuela touched it herself. I mean, the best facts for the defense here, right, are yes, we can't do that. But you could, right? And then they kind of hang around. It's not like they march out of the garage and move on with their day or go out to where they've got the defendant detained. They're kind of there and seeing what she's going to do. And, you know, of course they're thinking, I would think, you know, let's see what she does. If she does this, maybe we'll all benefit from seeing what's in there, right? So why isn't that indirect encouragement? I'm sure that occurred to them. I will say, I think factually in the videos, at the point at which Ms. Valenzuela procures the key and marches into the garage and opens the tool bench, it does appear from the videos that the police were preparing to pack up and leave. And so I don't think this is a pantomime where they were trying to nudge and wink her. Can you open the tool bench now? Which video should we look to to see that the police were packing, getting ready to pack up and leave? Is it the one where they're in the, I think it's in a kitchen and they're saying we can't arrest that one? Yes, and Ms. Valenzuela is very emotional. She's very distraught when she learns that they're not going to arrest her husband for the rape of her 14-year-old daughter. Well, that's the video where she says, he's accused of rape. I think this is the same video.  There are several, but we watched all of them. And he's accused of rape, and then she says, well, what if I accuse him of basically a drug crime? He's got drugs in there. Correct. And they don't say, yes, please open the tool bench. They don't say, have you found the key yet? She says, what if I accuse him of drug trafficking? And I'm paraphrasing. Those things that he used to make my daughter like that, where she's clearly talking about drugs, are in that tool bench just watching us all walk around. And then she procures the key, which she says her daughter found, I believe, in the bedroom, and opens it. And the only real verbal encouragement that she has is Detective Meyer's statement when she says, what if I open it or what if I show you? And he said, sure. Do you want to show me? Which I think was encapsulated in your question a moment ago. And that statement all by itself is not enough under this court's precedence for encouraging. And that's what Judge Forrest is asking. Why not? It's not. So there's, I think, a couple of reasons. I think the clearest and simplest one is you also look to the purpose of the private searcher. And in Reed, which I think is Mr. Serrano's best case, the evidence in that case was that I think it was a hotel clerk explicitly said, I had no other purpose. I wasn't trying to help the hotel. I wasn't trying to do anything. I just wanted to help the police. But that's a separate element, right? I mean, I think we think about this as two things. Do we have private conduct? And then does the private actor have their own reason for acting? And I agree with you that Reed, does the private actor have their own reason? The facts there look pretty different from this case. But on the first part about is this encouragement or is this mere acquiescence, I'm looking for sort of what is the material difference between this case and Reed on that element. I think the other difference is for mere acquiescence in the conduct to be a showstopping problem for a private search. I think the private search has to have some element of illegality. So that's when it's incumbent on the police not just to stand by or say, okay, well, if you want to open it, go ahead. I think that's when it becomes incumbent on the police to say, whoa, hang on. I don't think that you should do that. And I think in this case, in the district court, Mr. Serrano never made any argument of illegality. And, in fact, in the district court's careful decision, the district court said he's not arguing illegality. And I've looked and I can't find anything that makes what Ms. Valenzuela did illegal. And now an appeal in Mr. Serrano's opening brief, again, he didn't say anything about that. It's not until his reply brief that he now raises a new argument where he says, well, it could be California tortious interference or invasion of privacy or California tortious trespass. I don't think either of those fit the facts of this situation. As the district court said, it's not clear that one spouse can trespass into the property of another spouse in the shared marital home. Mr. Serrano has cited no case like that. And for an invasion of privacy under the California tort laws, it has to be an invasion that's highly offensive to a reasonable person. And one spouse going in another spouse's locked box in their shared garage doesn't seem to fit that element. So Mr. Serrano can't identify that Ms. Valenzuela's conduct was independently illegal. And I think a fair question is what were the police supposed to do at that point in time when she said, I can open the tool bench with the key? They weren't required to blind themselves. That's clear under Coolidge. Even that part's a little squishy because they ask her, can you open it? And she says, well, I can open it as in I can do it. And he's going to be angry. I apologize. I don't think they had it. I think it was pretty clear he he kept that area or at least that cabinet locked. Family had access to the garage, I think, for other reasons. But even that, she doesn't she does not indicate by my read that he allowed her to go in there into the cabinet. That's fair, Your Honor. And that's why we're not relying on any kind of consent. It would be a private search. And that's our legal position for searching the cabinet is that she did that herself. And to the court's question, I don't recall a moment in the video where they asked her, can you open it? I think that edges a little closer to them putting her up to it. I think what they did was they very scrupulously said, we can't open it. It's your property. We can't tell you what to do, but we can't open it. And if the court wants to go sort of underneath those verbal statements and say, well, we think that they were nudging and winking her. I think that's inconsistent with the district court's factual findings, which are entitled to deference under the clearly erroneous standard. So I think the facts as the district court found them are that the police were on site doing a scrupulous job and trying to abide by the rules of the road for this search. And that when they were preparing to pack up and leave, Miss Valenzuela, who had a powerful concern about her family's safety. And I think everybody recognizes that said, what if I search the tool bench? And the closest that they come to encouraging her is saying, sure, do you want to show me? Which even by its terms, punts the ball back into her court. I think that's the best that they could do under those circumstances. And I think that does not frustrate her private search of the tool bench. I don't think anybody's asked a question that indicates we want to get to any result. We are trying to be very scrupulous about what the record shows.  I think you may have misspoken then, perhaps. I apologize. That's all right. Judge Smith, anything from you? Nothing further. Thank you, counsel. Thank you. I think we understand the issue. I do think that essentially, given the circumstances, that this really was encouraging her to do something that they said we couldn't do but only she could. Where do we find that in the record? Well, they say we can't open it. If we can't open it, then what's left? She can. And so I think that gap of saying we can't do it but you can't. I mean, I don't think it's saying you can. But it is clear that they're saying we can't do it, and she's then coming up to say I essentially produces the key that causes them to do that. And I think, again, I'm not trying to make light of the circumstances on why she thought she was in danger, but she was not saying that. And in fact, she didn't want to leave the house. The house could be secured, and then they could have gotten a warrant. That would have meant we weren't even here. So thank you. Thank you both for your arguments. We'll take that case under advisement.
judges: SMITH, CHRISTEN, FORREST